# IN THE UNITED STATES BANKRUPTCY COURT
# FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | Case No. 09-10867 (KG) |
| PRIMUS TELECOMMUNICATIONS GROUP, INCORPORATED, et al., | Chapter 11 |
| Debtors.[1] | Joint Administration Pending |

**MOTION OF DEBTORS FOR ORDER PURSUANT TO BANKRUPTCY CODE SECTIONS 105(a) AND 363 AND BANKRUPTCY RULE 6003 AUTHORIZING(I) CONTINUED USE OF EXISTING CASH MANAGEMENT SYSTEM, (II) CONTINUED USE OF EXISTING BANK ACCOUNTS, (III) AUTHORIZING CONTINUED USE OF EXISTING BUSINESS FORMS, AND (IV) AUTHORIZING INTERCOMPANY TRANSACTIONS**

The debtors and debtors in possession in the above-captioned cases (collectively, the "Debtors") hereby move for entry of an order, under sections 105 and 363 of title 11 of the United States Code (the "Bankruptcy Code"), Rule 6003 of the Federal Rules of Bankruptcy Procedures (the "Bankruptcy Rules"), and Rule 2015-2 of the Local Rules for the United States Bankruptcy Court for the District of Delaware (the "Local Rules"), authorizing, but not directing (i) the continued maintenance and use of the Debtors' existing cash management system, (ii) the continued maintenance and use of the Debtors' existing bank accounts, (iii) continued use of existing business forms and checks; and (iv) the continuation of ordinary course intercompany transactions (the "Motion"). In support of the Motion, the Debtors rely upon and incorporate by reference the Declaration of Thomas R. Kloster, Chief Financial Officer of Primus Telecommunications Group, Incorporated, in Support of Chapter 11 Petitions and First Day

---

[1] The Debtors consist of: Primus Telecommunications Group, Incorporated; Primus Telecommunications Holding, Inc.; Primus Telecommunications IHC, Inc.; and Primus Telecommunications International, Inc.

Pleadings, filed with the Court concurrently herewith (the "Kloster Declaration"). In further support of the Motion, the Debtors, by and through their undersigned counsel, respectfully represent:

**BACKGROUND**

**A.     The Chapter 11 Filings**

1.     On March 16, 2009 (the "Petition Date"), Primus Telecommunications Group, Incorporated ("Primus") and three holding company subsidiaries (together with Primus, the "Debtors") each commenced a case by filing a petition for relief under chapter 11 of the title 11 of the United States Code, 11 U.S.C. §§ 101 et seq., as amended (the "Bankruptcy Code"). The Debtors continue to operate their businesses and manage their properties as debtors and debtors-in-possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code. The Debtors have requested that these chapter 11 cases (the "Chapter 11 Cases") be jointly administered.

2.     Also on the Petition Date, the Debtors filed the Joint Plan Of Reorganization Of Primus Telecommunications Group, Incorporated And Its Affiliate Debtors (Docket No. ___) (the "Plan"), and the Disclosure Statement with respect to the Plan (Docket No.____) (the "Disclosure Statement"). The Debtors have not yet requested a hearing on the adequacy of the Disclosure Statement.

3.     No creditors' committee has been appointed in these Chapter 11 Cases by the United States Trustee. No trustee or examiner has been appointed in any of the Debtors' Chapter 11 Cases.

4. The Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334. Venue is proper pursuant to 28 U.S.C. §§ 1408 and 1409. This is a core proceeding pursuant to 28 U.S.C. § 157(b)(2).

5. The statutory predicates for the relief requested herein are Bankruptcy Code sections 105(a) and 363, Bankruptcy Rule 6003, and Local Rule 2015-2.

**B.    Background and Current Business Operations**

6. The Debtors are holding companies that own 100% of the stock of various operating subsidiaries. These operating companies, which are not involved in these chapter 11 cases, operate as an integrated facilities based telecommunications services provider offering a portfolio of international and domestic voice, wireless, internet, voice-over-internet protocol (VOIP), data and hosting services to business and residential retail customers and other carriers located primarily in the United States, Australia, Canada, the United Kingdom, and western Europe. A complete factual background relating to the Debtors' commencement of their Chapter 11 Cases is set forth in detail in the Kloster Declaration, filed contemporaneously herewith.

**C.    The Debtors' Plan of Reorganization**

7. Prior to the Petition Date, the Debtors commenced negotiations with a majority of their senior noteholders. Those negotiations led to an agreement (the "<u>Plan Support Agreement</u>") between the Debtors and the holders of significant majorities of the outstanding principal amount of the Debtors' 14 ¼% Senior Secured Notes due May 2011 (the "<u>Second Lien Notes</u>") and the outstanding principal amount of the Debtors' 5% Exchangeable Senior Notes due June 2010 and 8% Senior Notes due January 2014 (collectively, the "<u>Senior Notes</u>"), and the Plan reflects that agreement.

3

8. The Plan provides for the exchange of $173.2 million of outstanding Second Liens Notes for a pro rata share of $123.4 million of reinstated and modified Second Lien Notes and a pro rata share of 50% of the equity of the reorganized company distributable to creditors under the Plan.

9. The Senior Notes would be exchanged for 50% of the equity of the reorganized company distributable to creditors under the Plan and warrants exchangeable into additional equity in the reorganized company at predetermined levels of enterprise value. Certain notes junior to the Senior Notes would be converted into warrants exchangeable into equity in the reorganized company, and existing equity would receive contingent value rights exchangeable into equity in the reorganized company after a predetermined level of enterprise value is reached. All other debts, contracts, and obligations would be reinstated and otherwise unaffected by the Plan and these Chapter 11 Cases.

10. The consummation of the restructuring through the Plan will reduce principal debt obligations by approximately $315 million, or over 50% of the Debtors' current debt obligations, correspondingly reduce interest payments by over 50%, and extend certain debt maturities. As a result, the Debtors expect to emerge in a stronger position to weather current global economic conditions with a stronger balance sheet and increased free cash flow.

**RELIEF REQUESTED**

11. By this Motion, the Debtors seek entry of interim and final orders (the "Order"), pursuant to Bankruptcy Code sections 105(a) and 363 and Local Rule 2015-2, authorizing (a) the continued maintenance and use of the Debtors' existing cash management system, (b) the continued maintenance and use of the Debtors' existing bank accounts, (c)

continued use of existing business forms and checks, and (d) the continuation of ordinary course intercompany transactions.

**BASIS FOR RELIEF**

**A. The Debtors Should Be Authorized To Continue To Use Their Existing Cash Management System**

12. Before the commencement of these cases, the Debtors and their non-Debtor subsidiaries (collectively, the "Company") used a coordinated cash management system to collect, transfer and disburse funds generated by their domestic and foreign operations and to record accurately all such transactions as they are made (collectively, the "Cash Management System") in the ordinary course of business. Importantly, the Company's Cash Management System has been constructed to provide a substantially unified system for the Company which allows for an integrated method of accounting for revenues to be collected and expenses paid. In this regard, all cash disbursements and receipts are approved and monitored, respectively, by the Company's financial personnel located at the Company's headquarters in McLean, Virginia. By centralizing oversight of the Cash Management System, the Company is able to facilitate cash forecasting and reporting, monitor collections and approve disbursement of funds, reduce administrative expenses by facilitating the movement of funds and the conversion to appropriate currencies, the development of timely and accurate balance and presentment information, and administer the various bank accounts required to effect the collection, disbursement and movement of cash.

13. The Company's Cash Management System is funded primarily by receipts received into the various lockbox and operating accounts held by non-debtor subsidiaries, which are then transferred to different disbursement accounts held by both the Debtors and the non-debtor subsidiaries. Overall, the Cash Management System consists primarily of 21 accounts

held by domestic non-debtor subsidiaries, approximately 65 accounts held by foreign non-debtor subsidiaries and 5 accounts held by the Debtors. The Debtors' accounts have been used for holding investment funds, managing intercompany transactions and disbursements (the "Bank Accounts"). A schedule of the Bank Accounts maintained by the Debtors, including the names and addresses of the institution, the general purpose of the Bank Accounts, and the Bank Account numbers, is attached as Exhibit A hereto.

14. Funds required for payment of obligations owed by the Debtors are transferred from the various Bank Accounts in amounts sufficient to cover items presented for payment. The Company utilizes the Bank Accounts held by the non-debtor subsidiaries to fund ordinary course obligations such as payroll, benefits disbursements, and vendor checks and wires, and to collect customer receipts. The Company manages the Bank Accounts held by the Debtors to fund specific obligations as more fully described below.

15. Each of the Debtor entities, except Primus Telecommunications International, Inc. ("PTII") maintains a checking account at Bank of America. The Debtors' primary checking account is held by Primus Telecommunications Group, Incorporated ("PTGI") (Bank of America Account No. 11067825, the "Primus Master Account") and is funded by an investment account[2] or non-debtor bank accounts. All intercompany transactions between the Debtors are funded through the Primus Master Account and the Debtors make payments on certain debt obligations from this account. The Debtors also make payments such as professional fees and financial reporting expenses, from this account. Primus Telecommunications IHC, Inc. holds a checking account (Bank of America Account No.

---

[2] The investment account (Bank of America Securities LLC Account No. 249-00424-1-9-LML) (the "Investment Account") is held PTII.

6

435003565531) that receives funding indirectly from the Primus Master Account and is used for payments on certain debt service obligations. Also, Primus Telecommunications Holding, Inc. ("PTHI") has a checking account (Bank of America Account No. 4134396314) that is used for payments to professionals and for certain debt service obligations. This account's balance is automatically swept daily to the Primus Master Account. PTII holds an investment account with Bank of America Securities LLC that was formerly used to invest excess cash. Additionally, PTII holds an account with National Australia Bank (Account No. 59-482-9158) that is occasionally utilized by a non-debtor operating subsidiary to satisfy a capital lease debt covenant.

16. In sum, the Company's Cash Management System allows for (a) overall oversight and management of funds, (b) cash availability when and where needed among the Debtors and their non-Debtor subsidiaries, and (c) the reduction of administrative costs through a method of coordinating funds collection, currency conversion and funds movement. The Debtors' smooth transition into, and out of, chapter 11, while preventing disruption at their non-Debtor subsidiaries, will be facilitated by their ability to maintain these Bank Accounts and operate this Cash Management System without interruption. Moreover, as described more fully below, the Debtors intend to use funds flowing through the Cash Management System to fund these cases. The Cash Management System allows the Company to manage all of their cash flow needs and includes the necessary accounting controls to enable the tracing of funds through the system to ensure that all transactions are adequately documented and readily ascertainable. The Debtor will continue to maintain detailed records reflecting all transfers of funds made through the Cash Management System.

17. The cash management procedures utilized by the Debtors constitute ordinary, usual and essential business practices and are similar to those used by other major

corporate enterprises. The Cash Management System benefits the Debtors in significant ways, including the ability to (i) provide oversight and management of funds in an integrated manner, (ii) ensure availability of funds when necessary, and (iii) reduce administrative expenses by facilitating movement of the funds and currency conversions and the development of more timely and accurate balance and presentment information.

18. In furtherance of this goal, the Debtors request that all banks at which the Bank Accounts are maintained (the "<u>Banks</u>"), be authorized and directed to continue to administer the Bank Accounts as such accounts were maintained prepetition, without interruption and in the usual and ordinary course, and to pay any and all checks, drafts, wires, or electronic funds transfers presented, issued or drawn on the Bank Accounts on account of a claim arising on or after the Petition Date, provided that sufficient funds are in such Bank Accounts. The Debtors further request that the Banks be restrained from honoring any check, draft, wire or electronic funds transfer presented, issued or drawn on the Bank Accounts on account of a prepetition claim unless (i) authorized by an order of this Court, (ii) not otherwise prohibited by a "stop payment" request received by the Banks from the Debtors, and (iii) supported by sufficient funds in the Bank Account in question.

19. To effectuate the foregoing, the Debtors request that the Banks be authorized and directed to honor all representations from the Debtors as to which checks should be honored or dishonored. To the extent that the Debtors have directed that any prepetition checks be dishonored, they reserve the right to issue replacement checks to pay the amounts related to such dishonored checks consistent with the orders of this Court.

20. The Debtors prefer to continue operating under the current Cash Management System during the pendency of these chapter 11 cases. Requiring the Debtors to

adopt a new cash management system and to integrate that system with the remaining non-debtor's cash management system would create unnecessary administrative problems, and would be much more disruptive than productive. Such disruption could have a negative impact on the Debtors' chapter 11 cases and their goal to reorganize expeditiously.

21. Allowing the Debtors to utilize their prepetition Cash Management System is entirely consistent with applicable provisions of the Bankruptcy Code. Bankruptcy courts routinely permit chapter 11 debtors to continue using their existing cash management system, generally treating such requests for relief as a relatively "simple matter." In re Baldwin-United Corp., 79 B.R. 321, 327 (Bankr. S.D. Ohio 1987); see also, In re Columbia Gas Sys., Inc., 136 B.R. 830, 934 (Bankr. D. Del. 1992) (recognizing that an integrated cash management system "allows efficient utilization of cash resources and recognizes the impracticalities of maintaining separate cash accounts for the many different purposes that require cash"), aff'd in part and rev'd in part, 997 F.2d 1039 (3d Cir. 1993), cert. denied. sub nom. Official Comm. of Unsecured Creditors v. Columbia Gas Transmission Corp., 510 U.S. 1110 (1994).

22. Additionally, this Court has granted substantially similar relief in other large chapter 11 cases. See, e.g., In re VeraSun Energy Corporation, (Case No. 08-12606 (Shannon, J.) (Bankr. D. Del. November 3, 2008); In re Goody's Family Clothing, Inc., Case No. 08-11133 (Sontchi, J.) (Bankr. D. Del. June 9, 2008); In re American Home Mortgage Holdings, Inc., Case No. 07-11047 (Sontchi, J.) (Bankr. D. Del. Aug. 7, 2007); In re Tweeter Home Entertainment Group, Inc., Case No. 07-10787 (Walsh, J.) (Bankr. D. Del. June 12, 2007); In re New Century TRS Holdings, Inc., Case No. 07-10416 (Carey, J.) (Bankr. D. Del. Apr. 11, 2007).

23. The Debtors therefore request authority to continue utilizing their Cash Management System as outlined herein.

9

### B. The Debtors Should Be Authorized To Maintain Their Existing Bank Accounts

24. The Office of the United States Trustee has established certain operating guidelines for debtors-in-possession in order to supervise the administration of chapter 11 cases. These guidelines require chapter 11 debtors to, among other things: (i) close all existing bank accounts and open new debtor-in-possession bank accounts; (ii) establish one debtor-in-possession account for all estate monies required for the payment of taxes, including payroll taxes; (iii) maintain a separate debtor-in-possession account for cash collateral; and (iv) obtain checks for all debtor-in-possession accounts which bear the designation "Debtor-In-Possession," the bankruptcy case number and the type of accounts. These requirements are designed to draw a clear line of demarcation between prepetition and postpetition transactions and operations and prevent the inadvertent postpetition payment of prepetition claims. Pursuant to Bankruptcy Code section 105(a) and 363 and Local Rule 2015-2(a), the Debtors seek a waiver of these requirements and authorization to continue using their existing bank accounts.

25. As noted above, before the Petition Date, the Debtors maintained Bank Accounts, out of which they managed intercompany transfers and disbursements. The Debtors routinely deposit, withdraw and otherwise transfer funds to, from and among the Bank Accounts by various methods, including check, wire transfer, internal bank transfer and electronic funds transfer. The Debtors complete numerous transactions per month through the Bank Accounts.

26. The Debtors seek a waiver of the United States Trustee's requirement that the Bank Accounts be closed and that new accounts be opened after the Petition Date. If enforced in these cases, such requirements would cause disruption in the Debtors' businesses, thereby impairing their efforts to reorganize and pursue other alternatives to maximize the value of their estates. The Debtors' Bank Accounts are a part of a carefully-constructed cash

management system that permits the Company to fund its ongoing operations in a streamlined and cost-efficient manner. In order to avoid delays in payments to administrative creditors and to ensure minimal disruption, it is important that the Debtors be permitted to maintain their existing Bank Accounts and, when necessary, open new accounts. This relief is also necessary to aid the Debtors in their collective efforts to complete their reorganization efforts successfully and rapidly.

27. The Debtors represent that if the relief requested in this Motion is granted, they will not pay, and the Banks, at which the Bank Accounts are maintained, will be directed not to pay, any debts incurred by the Debtors before the Petition Date other than as authorized by this Court. The Debtors will continue to work closely with the Banks to maintain the Bank Accounts against which checks are drawn in order to ensure that appropriate procedures are in place so that checks issued before the Petition Date on account of obligations of the Debtors, but presented after the Petition Date, will not be honored absent approval from this Court.

28. Accordingly, to ensure as smooth a transition into chapter 11 as possible with minimal disruption, and to aid the Debtors' efforts to complete these cases successfully and rapidly, the Debtors should be permitted to continue to maintain their existing Bank Accounts and, if necessary, open new accounts, wherever they are needed, whether or not such banks are designated depositories in the District of Delaware.

29. In other cases in this District, it has been recognized that the strict enforcement of bank account closing requirements may not always serve the rehabilitative purposes of chapter 11. Accordingly, courts in this District have waived such requirements and replaced them with alternative procedures that provide the same protections. See, e.g., In re VeraSun Energy Corporation, (Case No. 08-12606 (Shannon, J.) (Bankr. D. Del. November 3,

2008); In re Goody's Family Clothing, Inc., Case No. 08-11133 (Sontchi, J.) (Bankr. D. Del. June 9, 2008); In re American Home Mortgage Holdings, Inc., Case No. 07-11047 (Sontchi, J.) (Bankr. D. Del. Aug. 7, 2007); In re Tweeter Home Entertainment Group, Inc., Case No. 07-10787 (Walsh, J.) (Bankr. D. Del. June 12, 2007); In re New Century TRS Holdings, Inc., Case No. 07-10416 (Carey, J.) (Bankr. D. Del. Apr. 11, 2007).

C. **The Debtors Should Be Granted Authority To Continue To Use Existing Business Forms And Checks**

30. Local Rule 2015-2(a) provides

> Where the debtor uses pre-printed checks, upon motion of the debtor, the Court may, without notice and hearing, permit the debtor to use its existing checks without the designation "Debtor-in-Possession" and use its existing bank accounts. However, once the debtor's existing checks have been used, the debtor shall when reordering checks, require the designation "Debtor-in-Possession" and the corresponding bankruptcy number on all such checks.

L.R. Bankr. P. 2015-2(a).

31. In order to minimize expenses to their estates, the Debtors also seek authorization to continue using all correspondence and business forms (including without limitation, letterhead, purchase orders, and invoices), without reference to the Debtors' status as debtors in possession. Most parties doing business with the Debtors undoubtedly will be aware of the Debtors' status as debtors in possession as a result of the notoriety of these cases, the press releases issued by the Debtors, and any additional press coverage. Moreover, each of the Debtors' vendors will receive direct notice of the commencement of these cases.

32. Changing correspondence and business forms would be expensive, unnecessary, and burdensome to the Debtors' estates and disruptive to the business operations Debtors' operating subsidiaries and would not confer any benefit upon those dealing with the Debtors. This expense and disruption is further unnecessary because of the anticipated short

12

duration of these chapter 11 cases, as set forth in the Kloster Declaration. Moreover, checks issued by the Debtors are primarily used to pay certain professionals and make payments on account of debt obligations, and all of these parties are already aware of these chapter 11 cases by virtue of the prepetition negotiations set forth in the Kloster Declaration. For these reasons, the Debtors request that they be authorized to use existing checks and business forms without being required to place the label "Debtor-in-Possession" on each.

33.     This Court has routinely granted the same or similar relief to chapter 11 debtors. See, e.g., In re VeraSun Energy Corporation, (Case No. 08-12606 (Shannon, J.) (Bankr. D. Del. November 3, 2008); In re Goody's Family Clothing, Inc., Case No. 08-11133 (Sontchi, J.) (Bankr. D. Del. June 9, 2008); In re American Home Mortgage Holdings, Inc., Case No. 07-11047 (Sontchi, J.) (Bankr. D. Del. Aug. 7, 2007); In re Tweeter Home Entertainment Group, Inc., Case No. 07-10787 (Walsh, J.) (Bankr. D. Del. June 12, 2007); In re New Century TRS Holdings, Inc., Case No. 07-10416 (Carey, J.) (Bankr. D. Del. Apr. 11, 2007).

**D.     The Debtors Should Be Authorized To Continue Intercompany Transactions**

34.     Prior to the Petition Date, the Debtors have provided a number of services to each other and engaged in intercompany transactions with each other and with their non-Debtor subsidiaries (collectively, the "Intercompany Transactions"). The Company has invested in and finances its operations principally through debt issued by the Debtors as holding companies for the Debtors' operating company subsidiaries. In the ordinary course of their businesses, the operating subsidiaries upstream cash payments to the Debtors and the Debtors routinely engage in Intercompany Transactions in order to make interest or other payments to satisfy obligations based on such cash received from the operating subsidiaries. In addition, Intercompany Transactions amongst the Company cover a variety of items, including, without

13

limitation, allocation of cost of sales, management fees, allocation of insurance premiums, allocation of professional fees, allocation of back-office and management costs and other general corporate transactions.

35. The Intercompany Transactions are reflected in the books and records of each individual Debtor entity. Accordingly, the Debtors maintain records of all Intercompany Transactions and can ascertain, trace, and account for all Intercompany Transactions. Intercompany Transactions between the Debtor entities or between the Debtors and the non-debtor operating companies are either settled in cash or reflected in each entity's books and records at the time of the transaction.

36. The Intercompany Transactions are ordinary course transactions that are integral to the Company and the function of the Cash Management System. In order to ensure that the Debtors and the businesses of their non-debtor affiliates are not interrupted by these Chapter 11 Cases, the Debtors seek approval and authorization to continue to undertake the Intercompany Transactions in the ordinary course and consistent with past practice. These Intercompany Transactions will be used in part to fund these chapter 11 cases, including payment of professional fees, any interest payments or United States Trustee fees that may need to be paid during the cases, and any other administrative costs that may arise while the Debtors remain in chapter 11.

37. Courts frequently have authorized debtors to continue their prepetition intercompany funding practices after the commencement of chapter 11 cases. See, e.g., In re VeraSun Energy Corporation, (Case No. 08-12606 (Shannon, J.) (Bankr. D. Del. November 3, 2008); In re Goody's Family Clothing, Inc., Case No. 08-11133 (Sontchi, J.) (Bankr. D. Del. June 9, 2008); In re American Home Mortgage Holdings, Inc., Case No. 07-11047 (Sontchi, J.)

(Bankr. D. Del. Aug. 7, 2007); In re Dura Automotive Systems, Inc., Case No. 06-11202 (Carey, J.) (Bankr. D. Del. Nov. 20, 2006); In re Pliant Corp., Case No. 06-10001 (Walrath, J.) (Bankr. D. Del. Jan. 4, 2006).

### E. Bankruptcy Rule 6003 has Been Satisfied and Bankruptcy Rule 6004 Should be Waived

38. The Debtors further submit that because the relief requested is necessary to avoid immediate and irreparable harm to the Debtors for the reasons set forth herein, Bankruptcy Rule 6003 has been satisfied.

39. To implement successfully the foregoing, the Debtors seek a waiver of the notice requirements under Bankruptcy Rule 6004(a) and the ten-day stay under Bankruptcy Rule 6004(h).

**NOTICE**

40. Notice of this Motion will be given to: (a) the Office of the United States Trustee for the District of Delaware; (b) the Securities and Exchange Commission; (c) the Internal Revenue Service; (d) the United States Attorney's Office for the District of Delaware; (e) counsel for the Ad Hoc Group of Second Lien Noteholders; (f) counsel for the Ad Hoc Group of Senior Noteholders; (g) counsel for the Ad Hoc Group of First Lien Term Lenders; (h) counsel for Guggenheim Corporate Funding, LLC; (i) the parties included on the Debtors' list of twenty (20) largest unsecured creditors; and (j) the financial institutions at which the Debtor's maintain any bank accounts (collectively, the "Notice Parties"). The Debtors submit that, under the circumstances, no other or further notice is required.

**NO PRIOR REQUEST**

41. No previous request for the relief sought herein has been made to this or any other court.

15

## CONCLUSION

WHEREFORE, the Debtors respectfully request that the Court enter an Order, substantially in the form annexed hereto, granting the relief requested in the Motion and such other and further relief as may be just and proper.

Dated: Wilmington, Delaware
March 16, 2009

      */s/ Eric M. Davis*
Eric M. Davis (I.D. No. 3621)
Davis Lee Wright (I.D. No. 4324)
Skadden, Arps, Slate, Meagher & Flom LLP
One Rodney Square
P.O. Box 636
Wilmington, DE 19899
(302) 651-3000

- and -

George N. Panagakis
T. Kellan Grant
Nathan L. Stuart
Skadden, Arps, Slate, Meagher & Flom LLP
333 West Wacker Drive
Chicago, Illinois 60606
(312) 407-0700

Proposed Counsel for Debtors and
Debtors in Possession