IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE

|  |  |
|---|---|
| In re: | Case No. 09-10867 (KG) |
| PRIMUS TELECOMMUNICATIONS GROUP, INCORPORATED, et al., | Chapter 11 |
| Debtors. [1] | Joint Administration Pending |

## DECLARATION OF THOMAS R. KLOSTER IN SUPPORT
## OF CHAPTER 11 PETITIONS AND FIRST DAY PLEADINGS

I, Thomas R. Kloster, being duly sworn, deposes and says:

1. I am the Chief Financial Officer ("CFO") of Primus Telecommunications Group, Incorporated. ("Primus"), a company incorporated under the laws of the state of Delaware, and of each of the other debtors and debtors in possession in the above-captioned chapter 11 cases (collectively, the "Debtors") Hereinafter, the Debtors, together with the Debtors' non-Debtor affiliates, will be referred to as the "Company." I am authorized to submit this declaration (the "Declaration") on behalf of the Debtors. As a result of my being the CFO of Primus since January 1, 2005 and my previous appointment with the Debtors as Senior Vice President – Corporate Finance from August 2003 to December 2004, my review of relevant documents, and my discussions with other members of the Debtors' management teams, I am familiar with the Debtors' day-to-day operations, business affairs, and books and records. Except as otherwise noted, I have personal knowledge of the matters set forth herein and, if called as a witness, would testify competently thereto.

---

[1] The Debtors consist of: Primus Telecommunications Group, Incorporated; Primus Telecommunications Holding, Inc.; Primus Telecommunications IHC, Inc.; and Primus Telecommunications International, Inc.

2. To enable the Debtors to minimize the adverse effects of these Chapter 11 Cases (as defined below) on the Company's business, the Debtors intend to request various types of relief in "first day" applications and motions (collectively, the "First Day Motions"). I submit this Declaration in support of the Debtors' First Day Motions.[2] Except as otherwise stated, all facts set forth in this Declaration are based on my personal knowledge, my discussions with other members of the Debtors' senior management, managers, and members, my review of relevant documents, or my opinion, based on my experience and knowledge of the Debtors' operations and financial conditions.

3. Part I of this Declaration describes the Debtors' businesses and the circumstances surrounding the commencement of their Chapter 11 Cases. Part II of this Declaration sets forth the relevant facts in support of the First Day Motions filed concurrently herewith.

## I. BACKGROUND

### A. The Chapter 11 Filings

4. On March 16, 2009 (the "Petition Date"), each of the Debtors commenced a case by filing a petition for relief under chapter 11 of title 11 of the United States Code, 11 U.S.C. §§ 101 et seq., as amended (the "Bankruptcy Code"). The Debtors continue to operate their businesses and manage their properties as debtors and debtors-in-possession pursuant to sections 1107(a) and 1008 of the Bankruptcy Code. The Debtors have requested that these chapter 11 cases (the "Chapter 11 Cases") be jointly administered.

5. The Debtors commenced the Chapter 11 Cases to effect a balance sheet restructuring and have filed their joint plan of reorganization and disclosure statement with the

---

[2] Unless otherwise defined herein, capitalized terms used herein shall have the meanings ascribed to them in the relevant First Day Motion.

Court, thereby seeking to expedite these Chapter 11 Cases. The Debtors further expect to emerge from these Chapter 11 Cases in 90 to 120 days. As discussed below, the Debtors and certain Consenting Noteholders have entered into an agreement whereby the requisite number of noteholders have committed to support the restructuring through an agreed plan of reorganization (the "Plan Support Agreement").

6.　　No creditors' committee has been appointed in these Chapter 11 Cases by the United States Trustee. No trustee or examiner has been appointed in any of the Debtors' Chapter 11 Cases.

7.　　The Court has jurisdiction over this matter pursuant to 28 U.S.C. § 157 and 1334. Venue is proper pursuant to 28 U.S.C. §§ 1408 and 1409. This is a core proceeding pursuant to 28 U.S.C. § 157(b)(2).

**B.　　Background and Current Business Operations**

8.　　Founded in 1994, Primus is headquartered in McLean, Virginia and, together with the other Debtors and non-Debtor operating subsidiaries, provides facilities-based telecommunications services, including international and domestic voice, wireless, Internet, voice-over-Internet protocol ("VOIP"), data and hosting services. The Company serves corporate, small- and medium-sized business, residential and data, internet service provider ("ISP"), and telecommunication carrier customers primarily located in the United States, Australia, Canada, the United Kingdom and western Europe. For the year ended December 31, 2008, the Company had annual revenues of approximately $896 million.

9.　　The Company owns and operates an extensive global network of owned and leased transmission facilities, including 18 carrier-grade international gateway and domestic switching systems (the hardware and software devices that direct voice traffic across the

network), approximately 500 interconnection points-of-presence throughout the world, ownership interests in undersea fiber optic cable systems, and a variety of operational relationships that allow the Company to deliver telecommunications traffic worldwide. While smaller, less experienced, and lacking the resources of its major competitors, the Company has established strong positions in its major global markets, including ranking as the second largest alternative communications company and the fifth largest Internet service provider in Canada, the third largest Internet service provider and the fourth largest full service carrier in Australia.

10. In 2004, the Company began the process of transitioning from its core legacy businesses of long distance voice and dial-up ISP services – both of which were subject to product substitution and declining usage (cellular services replacing traditional land line phones; broadband Internet replacing dial-up ISP services) - into an integrated provider by expanding its portfolio to include high-margin products such as local voice, VOIP, broadband, wireless, data, and hosting services. These efforts enhanced the Company's bundled service capabilities, and as a result, reduced the competitive vulnerability of the Company's core retail voice long distance and dial-up ISP businesses. The Company's operational transformation efforts were effectively executed with revenues from these new offerings currently representing approximately 25% of total revenues.

11. The Company's revenues are solely derived from its telecommunications and related communications services respectively. During the first six months of 2008, the Company reported consecutive quarters of revenue growth, a significant accomplishment in the telecommunications industry and, as a consequence, raised its annual EBITDA (earnings before interest, tax, depreciation and amortization) guidance to $75 million and was targeting to become free cash flow breakeven during 2009. However, beginning in the last half of 2008, the

Company has experienced financial difficulties due primarily to the deteriorating global market, credit, and economic conditions. In particular, the Company was adversely affected by the dramatic strengthening of the U.S. dollar given that over 80% of its revenues are generated outside the United States in local currencies. In addition, the unavailability of credit made the prospect of the Company's ability to refinance approximately $24 million of debt maturing in the latter half of 2009 uncertain.

**C.    Prepetition Capital Structure**

12.    The Company has invested in and finances its operations principally through debt issued by the holding company Debtors to support the operating company subsidiaries. The operating subsidiaries have not commenced chapter 11 proceedings. As of the Petition Date, the Company's total consolidated funded debt obligations were approximately $575 million in principal amount and consisted of, among other things, term loans and secured and unsecured notes. The major components of the Company's consolidated funded debt obligations are described in greater detail below.

13.    <u>Senior Secured Term Loan Facility</u>. In February 2005, Primus Telecommunications Holding Inc. ("<u>PTHI</u>"), a Debtor and a direct wholly-owned subsidiary of Primus, entered into a six year $100 million senior secured term loan facility (the "First Lien Secured Term Loan"). The First Lien Secured Term Loan is guaranteed by Primus and certain of PTHI's subsidiaries and is secured by first priority liens on certain assets of PTHI and its guarantor subsidiaries, and by pledges of 65% of the capital stock of first-tier foreign subsidiaries. The Company borrowed $100 million under the First Lien Secured Term Loan in February 2005 and currently owes $96.25 million.

14.     <u>Second Lien Notes</u>.  In February 2007, the Company amended the First Lien Secured Term Loan to enable Primus Telecommunications IHC, Inc. ("IHC"), a Debtor and a wholly-owned subsidiary of Primus, to issue and have outstanding up to $200 million of existing authorized indebtedness including newly authorized 14 ¼% notes with a second lien security position (the "Second Lien Notes").  The Second Lien Notes are guaranteed by Primus, PTHI, IHC, and certain other subsidiaries, and are secured by a second lien on substantially all of the assets of IHC.  Certain obligations under the Second Lien Notes are guaranteed by Primus, PTHI, and certain subsidiaries and affiliates and are secured by certain assets of IHC and the guarantor subsidiaries and stock pledges.  In February 2007, IHC issued in private transactions $57.2 million in principal amount of the Second Lien Notes in exchange for $40.7 million of certain of the Company's outstanding securities and $23.6 million in cash.  In March 2007, IHC issued for cash in private transactions an additional $51.0 million principal amount of the Second Lien Notes with a $0.3 million discount.  In May 2008, IHC issued $67.1 million principal amount of the Second Lien Notes and cash in private transactions in exchange for certain of the Company's outstanding debt securities.  The Second Lien Notes mature in 2011 and as of the Petition Date approximately $173 million of the Second Lien Notes were outstanding (after accounting for approximately $2 million of IHC Second Lien Notes owned by the Company).

15.     <u>8% Senior Notes</u>.  In January 2004, PTHI completed the sale of $240 million in aggregate principal amount of 8% senior notes due 2014 (the "8% Senior Notes").  The 8% Senior Notes are guaranteed by Primus.  As of the Petition Date, $186 million of 8% Senior Notes remain outstanding.

16.     <u>5% Exchangeable Senior Notes</u>.  In June 2006, PTHI issued $56.3 million of the 5% exchangeable senior notes issued by PTHI and due 2010 (the "5% Exchangeable Senior

Notes ") for certain of Primus's outstanding securities.  As of the Petition Date, approximately $23.4 million of the 5% Exchangeable Senior Notes remain outstanding.

17.     3 ¾% Convertible Senior Notes.  In September 2003, Primus completed the sale of $132 million in aggregate principal amount of 3 ¾% Convertible Senior Notes due 2010 (the "3 ¾% Convertible Senior Notes").  As of the Petition Date, approximately $34.2 million of the 3 ¾% Convertible Senior Notes remain outstanding.

18.     Step Up Convertible Subordinated Debentures.  In February 2006, Primus completed the exchange of $27.4 million principal amount of Primus's subordinated debentures due 2007 for $27.5 million principal amount of Primus's step up convertible subordinated debentures due 2009 (the "Step Up Convertible Subordinated Debentures").  As of the Petition Date, approximately $8.6 million of the Step Up Convertible Subordinated Debentures remained outstanding.

19.     12 ¾% Senior Notes.  In October 1999, Primus completed the sale of $300 million in aggregate principal mount of the 12 ¾% senior notes due 2009 (the "12 ¾% Senior Notes").  As of the Petition Date, approximately $14.2 million of the 12 ¾% Senior Notes remain outstanding.

20.     Canadian Term Loan.  In March 2007, an indirect wholly-owned Canadian subsidiary, Primus Telecommunications Canada Inc. ("Primus Canada"), entered into a $35 million senior secured credit agreement (the "Canadian Term Loan") that matures in 2012 to refinance an existing Canadian credit facility.  The Credit Agreement is secured by the assets of the Company's Canadian operations and certain guarantees (including those issued by Primus, PTHI and Primus Telecommunications International, Inc.).

**D.     Events Leading To The Chapter 11 Filings**

21.     The Company's financial difficulties primarily stem from the deteriorating global commercial and credit markets, which began to accelerate in the second half of 2008.  As of September 30, 2008, the Company had $47.6 million of cash and cash equivalents and had significant debt service obligations.  While the Company has, since 2000, reduced its debt by approximately $700 million, its remaining level of debt together with recent market and credit challenges have constrained the Company in myriad ways.  The level of outstanding debt, together with current credit constraints in the capital markets, have limited the Company's ability to obtain necessary financing for working capital, capital expenditures, debt service requirements and other purposes.  Moreover, the Company's indebtedness required that a substantial portion – approximately $58 million annually – of the Company's cash flow be dedicated to the payment of principal and interest on outstanding indebtedness and other obligations and, as a consequence, such cash flow was unavailable for use in the business.[3]  The Company estimated that it required approximately $85 million in annual EBITDA to be cash flow breakeven (after covering debt service, capital expenditures, and cash taxes).  However, the current global financial crisis, together with the dramatic strengthening of the U.S. dollar,  has limited the Company's ability to generate sufficient cash from operations to maintain and to grow its business and to meet its debt obligations.

22.     In addition to the burden of servicing it debt obligations,  the Company is challenged by the competitive nature of the telecommunications industry and rapid technological change.  The local and long distance telecommunications, data, broadband, Internet, VOIP, data

---

[3]     In the past, the Company has serviced its debt through a combination of: (i) making cash payments for principal and interest; (ii) retiring debt by purchasing it at a discount; (iii) retiring convertible debt in exchange for shares of common stock; and (iv) exchanging unsecured notes for second lien secured notes.

and hosting, and wireless industries are intensely competitive with relatively limited barriers to entry. Product substitution (e.g., wireless/Internet for fixed line voice; broadband for dial-up ISP services) has resulted in revenue declines and corresponding margin contribution in the Company's legacy long distance voice and dial-up ISP businesses. Due to limited available cash and the need to service debt, the Company has been handicapped in its ability to meet these challenges by investing in sales and marketing initiatives.

23.    Most significantly, the recent severe downturn in global economic conditions, the strengthening of the U.S. dollar, and the contraction of capital markets has impaired both the Company's liquidity and its ability to service its debt. Since the vast majority –over 80% - of the Company's revenue is derived from sales and operations outside of the United States, such revenue is generated in the local currency for each country. The Company's debt, on the other hand, is denominated in U.S. dollars. As a result, the sharp strengthening of the U.S. dollar relative to foreign currencies has substantially reduced the amount of U.S. dollars the Company receives from its foreign operations and, in turn, has impaired the Company's ability to service its debt.

24.    Aside from the impact of the strengthening dollar, the global financial crisis has restricted the Company's access to liquidity in other ways. The unprecedented tightening of the global capital markets has limited the Company's ability to raise cash through debt issuances, refinancing, or equity issuances, as well as asset sales, given the declining asset values and the scarcity of credit available to potential buyers.

25.    Facing declining liquidity, upcoming interest payments and debt maturities – approximately $24 million is due in the latter half of 2009 – and the inability to access the capital markets to restructure its balance sheet, the Company pursued different strategic alternatives in

the fourth quarter of 2008 and early 2009, including seeking to extend the maturities on its debt

due in 2009, seeking to implement debt exchanges, seeking to issue new debt for cash and/or in

exchange for debt, and pursuing asset sales. Ultimately, the efforts to restructure outside of

chapter 11 were unsuccessful and the Company commenced discussions with major bondholder

constituencies. Those discussions resulted in seeking a consensual restructuring through these

Chapter 11 Cases in order to allow the Company to deleverage its balance sheet, continue

operations without disruption, and thereby maximize the value of the estates.

**E.     The Plan Support Agreement**

26.     The Debtors believe that the value of the Company's businesses would be

damaged significantly by a prolonged chapter 11 case or by the filing of bankruptcy proceedings

involving the non-Debtor operating subsidiaries. Therefore, the Debtors concluded, after

discussions with various noteholders, that the proposed restructuring should be implemented

through the Plan Support Agreement. In addition to negotiating the Plan Support Agreement with

the Consenting Noteholders, the Debtors also consulted with certain lenders under the First Lien

Secured Term Loan, and Guggenheim Corporate Funding LLC ("Guggenheim"), the

administrative agent for the Canadian Term Loan. The Debtors sought the support of the First

Lien Secured Term Lenders and Guggenheim because, among other things, initiating the Chapter

11 Cases would violate certain covenants of both the First Lien Secured Term Loan and the

Canadian Term Loan, and would result in an event of default. Upon an event of default, Lehman

Commercial Paper, Inc. ("Lehman"), as administrative agent for the First Lien Secured Term

Loan, and Guggenheim might have been able to exercise remedies against guarantor non-Debtor

operating subsidiaries that could disrupt the Company's operations, inhibit the Debtors' ability to

administer the Chapter 11 Cases, and frustrate the Company's ability to restructure its affairs in

the best interests of all stakeholders. Accordingly, the Debtors requested waivers to avoid breaching certain covenants upon the filing of the Chapter 11 Cases, which Guggenheim granted.

27. In consideration for the covenant waivers, the Debtors provided certain accommodations to the Canadian Term Loan. In addition to their commitment to pay reasonable fees and expenses of Guggenheim incurred while negotiating the waivers and their acknowledgement of certain obligations and guarantees under the Canadian Term Loan, the Debtors agreed to certain modifications of the Canadian Term Loan, including an adjustment to the interest coupon, a mandatory prepayment schedule and an earlier maturity in 2011 The waivers and amendments regarding the Canadian Term Loan were finalized prior to the Petition Date.

28. The Debtors attempted to reach a waiver agreement with the First Lien Secured Term Loan Lenders but negotiations ultimately were not fruitful. The Debtors proposed to reinstate the First Lien Secured Term Loan under their plan of reorganization and believed that implementation of such plan materially enhanced the position of the First Lien Secured Term Loan by (i) reducing overall debt on the Company by over 50%, (ii) reducing cash interest expense by over 50%, (iii) eliminating approximately $81 million of principal indebtedness that had been scheduled to mature prior to the First Lien Secured Term Loan, and (iv) pushing back the maturity of $175 million of debt (reduced to $123 million in the plan) to 2013 from its previously scheduled maturity of 91 days after the maturity date of the First Lien Secured Term Loan in 2011. Notwithstanding such favorable treatment to be accorded under the proposed plan, three parties representing a majority of the First Lien Secured Term Loan Lenders demanded substantial economic improvement to the terms of the First Lien Secured Term Loan, as well as substantive amendments to the existing Indenture that would severely restrict the incurrence of

indebtedness and impose numerous financial maintenance covenants in consideration for any agreement to waive defaults arising from the filing of these Chapter 11 Cases. The Debtors believed these demands to be wholly disproportionate to the treatment that the First Lien Secured Term Loan Lenders are entitled under the Bankruptcy Code. Accordingly, the Debtors filed for chapter 11 relief without the support of the First Lien Secured Term Loan Lenders.

29. The Plan Support Agreement between the Debtors and the Consenting Noteholders provides for (i) the reduction of principal debt obligations by approximately $315 million or over 50%, (ii) the reduction of interest payments by over 50%, and (iii) the extension of certain debt maturities. More specifically, the Debtors' balance sheet would be restructured by:

(a)     reinstating the $96 million Senior Secured Term Loan Facility due in 2011;

(b)     exchanging the $173 million Second Lien Notes due 2011 for a pro rata share of $123 million of new 14 ¼% notes due 2013 issued by IHC, subject to certain modifications, with a coupon payable in cash (10%) and pay-in-kind (PIK) notes (4 ¼%) and for a pro rata share of 50% of the equity in the reorganized company;

(c)     exchanging the 8% Senior Notes and 5% Exchangeable Notes for 50% of the equity in the reorganized company and warrants exchangeable into additional equity in the reorganized company at predetermined levels of enterprise value;

(d)     exchanging the 12 ¾% Senior Notes, 3 ¾% Convertible Senior Notes and 8% Step Up Convertible Subordinated Debentures for warrants exchangeable into equity in the reorganized company at predetermined levels of enterprise value;

(e)     cancelling all of the Company's existing equity interests and issuing contingent value rights (CVRs) exchangeable into up to 15% of the fully diluted value of the reorganized company after a predetermined level of enterprise value is reached; and

(f)     providing that key employees can attain up to 4% of the equity of the reorganized company through a combination of shares vesting upon attaining performance benchmarks and warrants for up to 6% exchangeable into equity in the

reorganized company based upon achieving predetermined levels of enterprise value.

30.     Based on this consensual arrangement, I believe the Debtors are positioned to emerge from these Chapter 11 Cases in approximately 90 to 120 days with a strong balance sheet and favorable liquidity to support ongoing business operations and debt service obligations.

## II.  FIRST DAY MOTIONS

31.     In furtherance of these objectives, the Debtors expect to file a number of First Day Motions and proposed orders and respectfully request that the Court consider entering the proposed orders granting such First Day Motions.  I have reviewed each of the First Day Motions and Orders (including the exhibits to the Motions and Orders) and the facts set forth therein are true and correct to the best of my knowledge, information and belief.  Moreover, I believe that the relief sought in each of the First Day Motions and Orders (a) is vital to enable the Debtors to make the transition to, and operate in, chapter 11 with minimum interruption or disruption to their businesses or loss of productivity or value and (b) constitutes a critical element in achieving the Debtors' successful reorganization.

### A.     Administrative and Procedural Matters

#### Joint Administration of Cases

32.     Primus is the direct or indirect parent or owner of the three subsidiary and affiliate debtors (the "Affiliate Debtors").  Each Affiliate Debtor is wholly-owned by the ultimate parent, Primus.

33.     I anticipate that the notices, applications, motions, other pleadings, hearings and orders in these cases will affect each of the Debtors.  Thus, I believe that the joint administration of these cases will avoid the unnecessary time and expense of duplicative motions, applications, orders and other pleadings, thereby saving considerable time and expense for the Debtors and

resulting in substantial savings for their estates. I also believe that such duplication of substantially identical documents would be extremely wasteful and would unnecessarily overburden the Clerk of the Court with voluminous filings. Finally, I believe that the use of a simplified caption for the jointly administered cases will enable parties-in-interest in each of the above-captioned cases to be apprised of the various matters before the Court.

Notification of Creditors

34.      The Debtors have several creditors, potential creditors, and parties in interest to whom the Debtors and/or the office of the Clerk of the Bankruptcy Court for the District of Delaware (the "Clerk's Office") must serve various notices, pleadings, and other documents filed in these cases. Such parties in interest could produce thousands of proofs of claim that must be docketed and administered. I believe that the size of the Debtors' creditor body makes it impracticable for the Debtors to, without assistance, undertake the task of sending notices and dealing with claims.

35.      In light of the number of anticipated claimants and parties in interest, the Debtors believe that appointing Epiq Bankruptcy Solutions, LLC ("Epiq"), an independent third party, to act as claims, noticing, soliciting, and balloting agent will provide the most effective and efficient means, and relieve the Debtors and/or the Clerk's Office of the administrative burden of noticing, administering claims, and soliciting and balloting votes. I believe that such assistance will expedite service of notices, streamline the case administration process and permit the Debtors to focus on their reorganization efforts. I believe that Epiq is well-qualified to provide such services, expertise, consultation and assistance.

**B.    Business Operations of the Debtors**

<u>Cash Management, Bank Accounts and Business Forms</u>

36.    <u>Cash Management</u>.  Before the commencement of these Chapter 11 Cases, the Debtors and the non-Debtor subsidiaries used a coordinated cash management systems to collect, transfer and disburse funds generated by their operations and to record accurately all such transactions as they are made (collectively, the "Cash Management System") in the ordinary course of business.  Importantly, the Cash Management System has been constructed to provide a substantially unified system for the Company which allows for an integrated method of accounting for revenues to be collected and expenses paid.  In this regard, all cash disbursements and receipts are approved and monitored, respectively, by the Company's financial personnel located at the Debtors' headquarters in McLean, Virginia.  By centralizing oversight over the Cash Management System, the Company is able to facilitate cash forecasting and reporting, monitor collection and disbursement of funds, reduce administrative expenses by facilitating the movement of funds and the development of timely and accurate balance and presentment information, and administer the various bank accounts required to effect the collection, disbursement and movement of cash.

37.    I believe that the use of the Cash Management System is essential to enable the Company to control and monitor funds, ensure cash availability and liquidity, effectively manage foreign currency conversions, comply with the requirements of their financing agreements, and reduce administrative expenses by facilitating the movement of funds and enhancing the development of accurate account balance and presentment information.  These controls are crucial given the number of cash transactions managed through the Cash Management System.

38.      The Company's Cash Management System is funded primarily by receipts received into the various lockbox and operating accounts held by non-debtor subsidiaries, which are then transferred to different disbursement accounts held by both the Debtors and the non-debtor subsidiaries.  Overall, the Cash Management System consists primarily of 21 accounts held by domestic non-debtor subsidiaries, approximately 65 accounts held by foreign non-debtor subsidiaries and 5 accounts held by the Debtors.  The Company's accounts have been used for holding investment funds, managing intercompany transactions and disbursements (the "Bank Accounts").

39.      Funds required for payment of obligations owed by the Debtors are transferred from the various Bank Accounts in amounts sufficient to cover items presented for payment. The Company utilizes the Bank Accounts held by the non-debtor subsidiaries to fund ordinary course obligations such as payroll, benefits disbursements, and vendor checks and wires, and to collect customer receipts.  The Company manages the Bank Accounts held by the Debtors solely to fund specific obligations as more fully described below.

40.      Each of the Debtor entities, except Primus Telecommunications International, Inc. ("PTII") maintains a checking account at Bank of America.  The Debtors' primary checking account is held by Primus Telecommunications Group, Incorporated ("PTGI") (Bank of America Account No. 11067825, the "Primus Master Account") and is funded by an investment account or non-debtor bank accounts.  All intercompany transactions between the Debtors are funded through the Primus Master Account and the Debtors make payments on certain debt obligations from this account.  The Debtors also make payments such as professional fees and financial reporting expenses, from this account.  Primus Telecommunications IHC, Inc. holds a checking account (Bank of America Account No. 435003565531) that receives funding indirectly from the

Primus Master Account and is used for payments on certain debt service obligations. Also, Primus Telecommunications Holding, Inc. ("PTHI") has a checking account (Bank of America Account No. 4134396314) that is used for payments to professionals and for certain debt service obligations. This account's balance is automatically swept daily to the Primus Master Account. PTII holds an investment account with Bank of America Securities LLC that was formerly used to invest excess cash. Additionally, PTII holds an account with National Australia Bank (Account No. 59-482-9158) that is occasionally utilized by a non-debtor operating subsidiary to satisfy a capital lease debt covenant.

      41.    I believe that the Cash Management System allows for (a) overall oversight and management of funds, (b) cash availability when and where needed among the Debtors and their non-Debtor operating subsidiaries, and (c) the reduction of administrative costs through a method of coordinating funds collection, currency conversion and funds movement. I believe the Debtors' smooth transition into, and out of, chapter 11, while preventing disruption at their non-Debtor operating subsidiaries, will be facilitated by their ability to maintain these Bank Accounts and operate this Cash Management System without interruption. The Cash Management System allows the Debtors to manage all of their cash flow needs and includes the necessary accounting controls to enable the tracing of funds through the system to ensure that all transactions are adequately documented and readily ascertainable. The Debtors will continue to maintain detailed records reflecting all transfers of funds.

      42.    I believe that the operation of the Debtors' businesses requires that the Cash Management System continue during the pendency of these Chapter 11 Cases. Furthermore, I believe that adopting new, segmented cash management systems would be expensive, would create unnecessary administrative burdens and would be disruptive to the Debtors' business

operations. Consequently, I believe that the maintenance of the existing Cash Management System is in the best interests of all creditors and other parties-in-interest.

43. _Bank Accounts_. As noted above, before the Petition Date, the Debtors maintained Bank Accounts, out of which they managed cash receipts and disbursements. The Debtors routinely deposit, withdraw and otherwise transfer funds to, from and among the Bank Accounts by various methods, including check, wire transfer, internal bank transfer and electronic funds transfer. The Debtors complete numerous transactions per month through the Bank Accounts.

44. I understand that the United States Trustee has established certain operating guidelines for debtors-in-possession in order to supervise the administration of chapter 11 cases. I believe that under the circumstances, a waiver of the United States Trustee's requirement that the Bank Accounts be closed and that new post-petition bank accounts be opened is warranted. If enforced in these cases, I believe that such requirements would cause significant and unnecessary disruption in the Debtors' businesses, thereby impairing their efforts to reorganize and pursue other alternative to maximize the value of their estates.

45. The Debtors' Bank Accounts are a part of a carefully-constructed cash management system that permits the Company to fund their ongoing operations in a streamlined and cost-efficient manner. In order to avoid delays in payments to administrative creditors and to ensure minimal disruption, I believe that it is important that the Debtors be permitted to maintain their existing Bank Accounts and, when necessary, open new accounts. I also believe that this relief is necessary to aid the Debtors in their collective efforts to complete their reorganization efforts successfully and rapidly.

46. _Business Forms_. In the ordinary course of business the Debtors used numerous business forms including, but not limited to, letterhead, purchase orders, invoices, contracts and

checks (collectively, the "Business Forms") prior to the Petition Date. In order to minimize expenses to the Debtors' estates, the Debtors are requesting authorization to continue to use all Business Forms subsequent to the Petition Date, without reference to the Debtors' status as debtors-in-possession.

47. I believe that a requirement that the Debtors change their Business Forms would be expensive and burdensome to the Debtors' estate and extremely disruptive to the Debtors' business operations. This expense and disruption is further unnecessary because of the anticipated short duration of these Chapter 11 Cases. Moreover, checks issued by the Debtors are primarily used to pay certain professionals and make payments on account of debt obligations, and all of these parties are already aware of these Chapter 11 Cases by virtue of the prepetition negotiations. Consequently, I believe that the costs and potential disruption are not justified in this case.

48. Intercompany Transactions. In the ordinary course of the Debtors' businesses, the Debtors have provided a number of services to each other and engaged in intercompany transactions with each other and their non-Debtor operating subsidiaries (collectively, the "Intercompany Transactions"). The Company has invested in and finances its operations principally through debt issued by the Debtors as holding companies for the Debtors' operating company subsidiaries. In the ordinary course of their businesses, the operating subsidiaries upstream cash payments to the Debtors and the Debtors routinely engage in Intercompany Transactions in order to make interest or other payments to satisfy obligations based on such cash received from the operating subsidiaries. In addition, Intercompany Transactions amongst the Company cover a variety of items, including, without limitation, allocation of cost of sales,

management fees, allocation of insurance premiums, allocation of professional fees, allocation of back-office and management costs and other general corporate transactions.

49.    The Intercompany Transactions are reflected in the books and records of each individual Debtor entity.  Accordingly, the Debtors maintain records of all Intercompany Transactions and can ascertain, trace, and account for all Intercompany Transactions. Intercompany Transactions between the Debtor entities or between the Debtors and the non-debtor operating companies are either settled in cash or reflected in each entity's books and records at the time of the transaction.

50.    I believe that the Intercompany Transactions are integral to the Company's' businesses and the function of their Cash Management System.  These Intercompany Transactions will be used in part to fund these Chapter 11 Cases, including payment of professional fees, any interest payments or United States Trustee fees that may need to be paid during the cases, and any other administrative costs that may arise while the Debtors remain in chapter 11.  In order to ensure that the businesses of the Debtors and their non-debtor affiliates are not interrupted by these Chapter 11 Cases, I believe it is necessary for the Debtors to continue to undertake the Intercompany Transactions in the ordinary course and consistent with past practice.

Waiver of Investment and Deposit Requirements

51.    I am advised by counsel that section 345 of the Bankruptcy Code establishes certain investment and deposit restrictions.  I believe that the Debtors' use of the Bank Accounts substantially conforms with the approved investment practices identified in section 345 of the Bankruptcy Code, and that all deposits and investments into the Bank Accounts are safe, prudent and designed to yield the maximum reasonable net return on the funds invested.

52.     As described above, the Debtors Cash Management System consists of five Bank Accounts utilized by the Debtors through which the Debtors are able to manage cash receipts and disbursements.  To the extent that any account is construed to have a balance substantial enough to fall within the ambit of the Bankruptcy Code section 345 protections, I believe that the safety presented by the financially stable banking institutions with whom the Debtors bank constitutes sufficient cause to allow the Debtors to deviate from approved investment and deposit practices established by the Bankruptcy Code.  Consequently, in my opinion, a waiver of the section 345 requirements is in the best interests of the estates, all creditors and other parties-in-interest.

Procedures for Trading Equity Securities

53.     The Debtors seek authorization to protect and preserve valuable tax attributes, including net operating loss carryforwards ("NOLs") estimated to be in excess of $240 million (the "Tax Attributes") by establishing notice and hearing procedures regarding the trading of Primus equity securities that must be complied with as a precondition to the effectiveness of such trades or transfers.  If no trading restrictions regarding equity securities are imposed by this Court, unrestricted trading or transfers of equity securities could severely limit or even eliminate the Debtors' ability to use their Tax Attributes, a valuable asset of the Debtors' estates, and could have significant negative consequences for the Debtors, their estates and the overall reorganization process.  The Debtors seek limited relief that will enable them to monitor closely certain transfers of Primus equity securities, so as to be in a position to act expeditiously to preserve their Tax Attributes.

54.     By establishing procedures for continuously monitoring equity-securities-trading, the Debtors can preserve their ability to seek substantive relief at the appropriate time if it appears that additional trading of equity securities may jeopardize the use of their Tax Attributes.

I believe that the requested relief imposes a minimal burden to achieve a substantial benefit. Accordingly, I believe that the relief requested herein is in the best interests of the Debtors, their estates, and creditors and should be approved.

### III. CONCLUSION

55.     The Debtors' ultimate goal is to reorganize their financial affairs under the terms of a confirmed chapter 11 plan.  In the near term, however, to minimize any loss of value of their business during their restructuring, the Debtors' immediate objective is to maintain "business-as-usual" during the pendency of these Chapter 11 Cases, with as little interruption or disruption as possible to the operations of the Debtors and the non-Debtor operating subsidiaries.  I believe that if the Court grants the relief requested in each of the First Day Motions, the prospect for achieving these objectives and completing a successful, rapid  reorganization of the Debtors' business will be substantially enhanced.

I declare under penalty of perjury that the foregoing is true and correct.

Executed this 16th day of March 2009.

By: _Thomas R. Kloster_

Thomas R. Kloster
Chief Financial Officer of Primus
Telecommunications Group, Incorporated